Adoption of B.D.D.L. Number 5-18-0-5-50. Council ready? Yes, Your Honor. Thank you. Close the court. Would you mind closing that board just for a minute? Make sure he's given time for that. It is my honor to appear before Your Honors today representing Jonathan Lynch, a young man who we believe... Counsel, can you, I'm sorry, can you identify yourself? Oh, I'm sorry. Michael Meyer from Effingham. I missed that part, Your Honor. Thank you. It is my pleasure and honor to be here today representing Jonathan Lynch, a young man who we believe has suffered injustice in the circuit court in Crawford County twice. The first being during the pendency of case number 14-D-58 in which his marriage to Nancy Williams, the mother of the child, was dissolved. And the injustice was that the maternal grandparents, Mr. and Mrs. Hoke, intervened in that case and obtained primary parental responsibility, a.k.a. custody of the subject child, without notice of any kind to my client, Jonathan Lynch, the father. The second miscarriage of justice was the subject of this appeal, which is the finding of unfitness rendered by the court in Crawford County. So we are here today to challenge that finding of unfitness, and we understand completely that we have an uphill battle in terms of the fact that the standard of review, at least as to Parts 1 and 2 of our brief, is manifest way to the evidence. However, I would hasten to point out that the other side should have had an uphill battle in the circuit court because their burden was clear and convincing evidence, and we submit that that burden was not met on any of the bases for a finding of unfitness. In any event, Judge Weber in Crawford County found that my client was unfit under Section 1DB of the Adoption Act for failing to maintain a reasonable degree of interest, concern, or responsibility for the minor's welfare. And also under 1DN, his finding was, and I'm quoting from the order, he's unfit as evidenced by his intent to forego his parental rights as manifested by his failure for a period of 12 months commencing December 2015 to visit with the child, communicate with the child, although able to do so, etc. Counsel, does the record indicate that, in fact, your client had no contact with his son from December 2015 to May 2017? Physical contact? That's correct. Well, what about, okay, no physical contact, but other types of contact, whether, you know, telephone.  That's true. There is evidence that he talked to the child on the telephone, particularly after the visit during Christmastime of 2015 and for some period of time thereafter. So there was contact by telephone, and there were attempts to contact by physical presence as well, which I'll get to. Is that the Robinson, Illinois trip? Yes, Your Honor. Did anyone see him in Robinson, Illinois? There's no evidence in the record that anyone did. Because he drove a long way. He did. And then he stays a couple hours, according to his testimony, and does he go over to the Oaks house? He goes to where he thought they lived, the last he knew, and is unable to contact anyone. He's also unable to contact the person that he thought was the custodian, and might have still been at that time, the mother, Nancy Williams. He wasn't able to contact anybody. And because of his work schedule in Sweeney, Texas, his testimony being that he, 1,100 miles away from Robinson, Illinois, worked as a welder five, sometimes six days a week, with no vacation time. That was his testimony. But he was injured part of this time, was he not? He certainly was, Your Honor. Assuming they didn't work when he was injured? He did not. But his injury was that a piece of iron, I-beam, I think it was, fell on both of his feet, causing fractures, and he was in foot casts. This happened in 2014. He was unable to work or drive for about nine months in 2014. And then he was told that he needed more surgery. He delayed that surgery so that he could visit with the child in December of 2015, and also during the child's birthday a few months earlier. And then he went back to Sweeney and had more surgery in February of 2015. According to his testimony, he was not able to work or drive until, at one point in the transcript, it says June or July, and at another point it says August of 2015. So he was unable because of that physical problem. You're saying 2015. I don't know the relevant date. I'm sorry. December 2015 to May 2017. I got it wrong. I apologize. During 2015, he was off for nine months. And then in 2016, February, he had more surgery and was off until June, July, or August. The record is conflicting on that. But it was five or six months during the very year that Judge Weber found that he failed to visit. And, of course, we've cited in the brief the case law to the effect that the court needs to consider circumstances and impediments to the ability of the parent at issue to comply with the requirements of this statute. Counsel, it looks like the court considered, did the court consider these factors but just basically made credibility findings against your client? I say in my brief that the court paid lip service to those rules. But if the court reviews the order, and I complain at length in Part 3 of our brief about several areas in which the court considered irrelevant evidence and facts or twisted them, in my view, to conform with the result in that case, and there are some 14 or 15 points that are raised in Part 3 of the brief on that subject. So did the court consider the impediments? The court mentioned them. The court minimized them. In fact, one of the points we make is that the court seemed to be challenging the mere fact that my client was injured by saying that he didn't produce any medical records. Well, that was not a disputed issue in the case. And nobody talked about medical records during the trial. That suddenly came up in his order. And there are other factors such as that, and I've listed 14 or 15 of them. As to his child support, we say that he's showing responsibility, interest and concern for the child by paying his child support during this whole period of time. And he testified that he produced in court, in large exhibit form, all of the receipts he could find about the child support. Of course, he had no idea he'd have to do that until he got served with the adoption petition. The court ignored that testimony and made a finding and did the mathematical calculation. It's just an example that if you figure out how much child support he should have paid and subtract the amount that's shown by those receipts, he had an allergic in child support. So the court is attacking that. The petitioners didn't attack that. The court did in the order. So it's my view, based on all these factors, that in reality, Your Honors, Jonathan Lynch had not one but two advocates against him during that trial. One was Mr. Reardon, my colleague, and the other one was Judge Weber. And there are many other examples cited in Part 3 of the brief. For example, Judge Weber sets forth that he's taken judicial notice of several things. None of this was during the trial. It all came out in the order of the criminal record of Nancy Williams and her husband, which has nothing to do with the factor that's supposed to be considered, which is the conduct of Jonathan Lynch. I'm sorry, Your Honor. I'm having trouble hearing you. That's why I was leaning forward. I'm sorry. What about the criminal record of who? Nancy Williams and her husband, which has absolutely nothing to do with what the focus should have been, which is the conduct of my client, Jonathan Lynch, and the circumstances and impediments that prevented him from doing better, of which there were many. The court took judicial notice after the trial of other things, like the fact that Marathon Oil Company is the biggest employer in Crawford County. And to that I say, what? Judicial notice? It was my understanding always that that's something that should be brought out during the trial so that it can be discussed and attacked and cross-examined or whatever, but Judge Weber comes up with these things after the trial's over. That can't be proper. So you're saying that the things he took judicial notice of were not requested by counsel during the hearing? They were not. And so Marathon Oil Company is the biggest employer in Crawford County. So what? That's a veiled attack on the fact that my client moved to Texas for economic reasons because he could make $30 an hour down there, his testimony being that he couldn't do that well anywhere in Crawford County, which is another thing that Judge Weber seems to set himself up as an expert on the employment situation in Crawford County. In paragraph 16, I think it is, of his order, where he recites his own personal knowledge of the way that employees react and interact with Marathon Oil Company in Crawford County. None of that was in the evidence. It's like not only being an advocate but being a witness for the other side in this case, not to mention the other irrelevancies, and they're all set forth in Part 3 of the brief. So I guess what I just said was in response to questions, but I'll continue unless there are more right now. Why is it that the child's mother is incapable of caring for this child? That was not really in the record in this case. It's my understanding that sometime during 2016, there were order of protection proceedings brought by Mr. and Mrs. Holk because the mother, and I think this is in the record, and her husband were involved with drug use of some kind. So they brought O.P. proceedings to get the child out of that home. That's what happened. Why is she unfit? Because she didn't show up. She was defaulted in the adoption case. At what point in the adoption case? At the point of intervention? No. It was after in the D case there was the intervention and the order granting the Holks, quote-unquote, custody. And then later on, the adoption proceedings were filed in May or March of 2017. And prior to the time we had our trial, Nancy Williams was found to be in default. As I recall, she failed to appear at a pretrial or something. So she was defaulted and found to be unfit by default. My client, on the other hand, tried to contest those proceedings and, as I say, was met with double-barreled advocacy on the other side. Now, I think it's important to recognize that the impediments and the circumstances that might have prevented my client from doing better were many. The distance between Sweeney and Robinson, Illinois, 1,100 miles a two-day drive, and the others that are mentioned in the brief. All right. Thank you, counsel. You'll get an option for rebuttal. Thank you, Your Honor. Good afternoon. Todd Redenong, Catholic. To the petitioners, I believe. Mr. Myers. Your Honors. Your Honor, I'm going to avoid Part 3 of this brief. The simple fact is all we have to do is prove the court found one reason verifiable to terminate. That's all it requires. You don't have to prove ten. If you allege ten and the court finds ten, at the trial court, the appellate court says, well, we disagree on nine of them. All it takes is one. And the first one, Judge, Your Honors, is it's uncontroverted that in March of 16, a phone call was placed to the appellate, Mr. Lynch. Get up here. Stuff's hitting the fan. You know, she's doing drugs or her new husband's doing drugs. They're trying to remove the child from our home. We need your help. He admits in the record that he gets that phone call from the hoax and myself. Do what you can do to get my son out of harm's way. The hoax do that. Then they care for the child as they have. Now, this is right after he's had surgery. Did you know that? Did he tell you that? He advised that he could not get up here at this time, but to do whatever they had to do to protect the child. You also put yourself in as a witness. Did he tell you that he had foot surgery in February? He did not. I don't think he came up to tell me that. I think he said he was unable at this time to get there, and he told the hoax to do what they had to do. Okay. That's not unreasonable, is it? He just had foot surgery. Both feet are in casts. I would say no, but that doesn't mean you can just ignore the problem. No, I haven't got that far yet. I'm just saying at that moment in March, when he says, do what you can do, I can't get there. When he tells the hoax that, yes. That's not unreasonable. I would say no, it's not unreasonable. Okay. Moving forward, prior to that, going back in time, December 15, he's aware that the child is staying at the hoax residence. He talks about going to visit the Head Start where the child goes to school, and it's through his residence with the hoax, not with the mother. Had anybody notified him of that? I think he became aware when he was up visiting. Had anybody told him after March that he changed school? He never changed schools. He had always been enrolled at school at Head Start through the hoax residence. He never had the mother's, was never staying at the mother's. What brought along the O.P. was she was trying to pull him out of the hoax residence, where she then, her and her current husband have, and the court found, some serious substance abuse issues, and it would not be appropriate for the child to go there.  So I don't understand why he didn't know where the child was at school. He said he tried to find the child when he came up here. Which would have been in August. In August. His testimony was he came up at an unknown date in August and went by the hoax residence, and they weren't home. I don't know if it was a weekend. He didn't know the date. I don't think there was ever a date pinned down, and the child necessarily wouldn't necessarily be in school if school isn't in session. But he knew where the kid went to school. School does start in August, doesn't it? I think it depends on the community, Your Honor. Many communities, they do start in August. Yes, and this was not a kindergarten. This was a pre-kindergarten Head Start program. So when they kicked off their school year, I don't think Everett was fully developed and shrouded up. I guess what I'm trying to figure out is he does come up here. Has anybody indicated to him that the child is still living with the hoax? Addresses? I mean, is there an exchange of information, not just from the father, but the other way? In the year 2016? In August. From March until August. My understanding is he testified that he was receiving text messages from Nancy on how the child was doing. So at least we have some interest there. I would say that he is communicating with Nancy at some point. The volume of it, I don't know. It wasn't. He said he made contact with Nancy. But then the briefs indicate that there were several hundred. And counsel misspoke. It was Cynthia Williams as the biological mother. He had contacted Cynthia Williams, the biological mother, 200 times is what he testified to. And in those 200 occasions, the child was never present. It was always at the hoax. And the Guardian-At-Light had inquired, that didn't send an alarm off in your mind that you've called 200 times? That was his testimony. And the child is never there. Always at the hoax. At some point, it becomes blind ambivalence and we bury our head in the sand. I've made 200 attempts. Child's never there. The last contact I had with the child, the child's living at the hoax, going to school from Head Start from their residence. But yet I'm still contacting Cynthia Williams to inquire about the child. You mentioned the GABL. So was the Guardian-At-Light on this? Did the Guardian-At-Light testify? Did he give a report? He gave a report and he questioned. It was, I thought, a very poignant question. You said that you called the mother 200 times. And the child was never there. And that didn't raise suspicions in your mind. And he said no. And then at other points he talked about what good care the hoax provided. So if it was in the hoax care, he had no concerns because the hoax do provide good care. But at some point, as a parent, you have to step up to the plate. You can't let other people raise your children. Or you take the risk of what happened here. Sitting back and waiting for the world to come to you, you can't do it as a parent. You can't sit back. What about notice? I understand your point about you can't let other people do it. But if you start legal proceedings and don't give somebody notice. Judge, the notice was clerically deficient. I admit that. We had sent notice to him but didn't say attorneys of record. But the mailing says to him. The mailings say to all attorneys of record. It doesn't list him, does it? No, it doesn't. So, I mean, these are representations that the court relies upon saying, well, we got notice. He doesn't show up. I understand. And yet, in fact, no notice. That's very concerning when you're talking about rights to your child. I would agree, Your Honor. And I don't want to make light of that. But at some point, he was aware that an order of protection was being sought. And there was never a follow-up. Against him? No, for the child's protection. For the child's protection. But didn't you just tell us that he had told them that he was in agreement with that? No, he said to do whatever you have to do. Well, isn't that being in agreement with protecting the child? Yes. But that doesn't then absolve his responsibilities to then come and try to take some steps himself. Or do they languish under an order of protection in the grandparent's home for years? Well, but there was some communication from Nancy Hope to him. He said he received text. Does your client deny that? I think she said that there was text about the OP and getting the OP, and he admitted that he got text about the OP. So what was the duration of the OP? I think the court entered it, and this is where it got off track. He then wanted the mother to take some responsibility and suggested, you know, that we're going to put a mediator involved and try to get Mom to, and she's not a part of this, to do what a mother should do, take some effort, and then they had scheduled a period of visitation for her. It was going to be Sundays and Mondays, and then I think she exercised the one the record was out of the several that were supposed to occur, and then the hoax and frustration filed an adoption petition to try to get the parents' attention, I think, and Mrs. Williams, you ask what happened to her, she simply showed up the first time to adoption court, never showed back up, never disputed the pleading, and was defaulted, I think, in October of 17. A default order was held and evidence was produced as to her inactions. But the petition for termination of parental rights that was filed March 15, 2017, did he get notice of that? Who's he?  Father. He was served with summons, and then an amended petition was filed because he challenged some of the pleadings that it didn't specify. It was a 2-6-15 motion. We sought leave and filed an amended petition, which was answered, and then we went to trial on it. And on November 2, 2016, let's go back to the year 2016 now, in March, he gets a call. He's had surgery. He can't move. He tells you to do what you can do. Tells the hoax, directs them to do what they can do, yes. Six months later, the hoax are granted primary care of the child. And those intervening six months at the court told the hoax and Cynthia during the OP to go meet with the mediator, try to work this out. Right. And what I'm asking is from March until the hoax were granted primary care of the minor child, Mr. Lynch had no notice that any of this was going on, no legal notice. Probably no legal notice, but he was aware of the OP was sought. Well, that was back in March. But I'm talking about this whole six-month period that led up to a court order giving primary care of the child to the hoax. But more importantly from my perspective, in that court order, it says he got no parenting time granted. So I'm not going to blame you for that, but somebody requested that at the time the hoax got custody of this child, when the father knew nothing that was going on from a legal perspective, the court also ordered no parenting time for the child. I don't understand how that could happen. I think the court did that because he didn't participate in the mediation. But how do you do that if you don't get notice? That's my problem. And I understand the court's concern. Who filed those pleadings? Did you? I did. I filed the pleadings for the parenting time, yes, way back. Why didn't you give him notice? I thought we had. I obviously was deficient in my notice. But his testimony was, and Mrs. Williams was, that she was in contact with him and he wanted her to have the kids back and they came out in the divorce case. Still, I mean, you know. I understand, Your Honor. I understand. Did he ever, so he didn't have notice, and there's this order that says he doesn't have any parenting time. Did he ever seek? Was he, well, I have two questions. Since he didn't have notice, was he aware of the order? And then number two, I think I've looked at your arguments, number two, did he ever actually seek time with the child? As far as. I guess he drove up here. The August, I believe he said he came up in August of 2016. Other than that, no. I don't know what he told Cynthia Williams in their 200 phone conversations. Was that phone calls or texts or both? I believe his testimony was that he had called her 200 times between, he estimated, I think it was, between December 15th and 2016. So the order entered November 2nd, 2016, that gives your clients custody of the child. No parenting time for father, but parenting time for mother. What happens as far as father's relationship between November 2nd, 2016, and the finding of unfitness? Is there absolutely zero contact by Mr. Williams? It's my understanding he testified that he attempted to make contact the day before court in May of 18, I believe. So there's no contact with the hoax, no, and nothing except payment of money. He didn't pay money. I think he sent money. Western Union was the testimony to the Walmart in the name of Cynthia Williams. Did he have receipts for that? He produced receipts to the trial court. We didn't dispute he was sending money to Cynthia Williams. I don't think that was ever a pleading that we said he did not do. I think we... I mean, in so many of these cases, we see where the father doesn't step up and pay his child support. I understand. He was paying for child support and doesn't even see his child. It's kind of odd. So you're saying there was no contact by this father from November 7, 2016, to the finding of unfitness? That's my understanding, yes. And just for the record, the finding of unfitness was May 25, 2018? That sounds accurate. All right. Thank you, Counselor. I'm sorry, Your Honor. Thank you. Your Honor, I believe that there were attempts to contact by Jonathan Lynch after the custody changed in November 2016, which he didn't know about, by virtue of him continuing to call and speak with Cynthia Williams, the mother. And his testimony was that he called Cynthia Williams 200 times, once or twice a week, and the reason that he called was to check on the welfare of his child. That didn't stop after this order of November that he didn't know anything about. Now, did Cynthia Williams tell him about the order? He testified no. One reasonable inference for that could very well be that Cynthia Williams, in spite of the court's order to the contrary, continued to accept the child support, even after that order was entered. So she had an economic motive not to tell my client what was going on in Robinson, Illinois. He didn't know. The thing that bothers me most about this case, Your Honor, is the proceedings in the dissolution case. There's absolutely no evidence that my client got legal notice or any other kind of notice. No witness was called that said, I put that envelope in the mail addressed to Jonathan Lynch. No witness was called who said, I told Jonathan Lynch about those proceedings or that the custody had been changed. There's nothing there but his testimony that he didn't know, and he didn't know until he was served. In fact, he never got a paper out of Mr. Reardon's office about anything until he was served by Texas Ranger or whoever serves process in Texas with the petition for adoption, which said in it that the folks had custody. He testified that was a surprise to him. He virtually immediately retained counsel, myself, and who appeared in the D case filed a motion to vacate that, which hasn't been heard because of the pendency of the adoption proceedings, and proceeded to represent him. He immediately took action. This is an unsuccessful attempt to see the child made in Robinson. Was it after he received the summons on the adoption case, or was it before? It was before. His trip to Robinson was August of 2016. The adoption proceedings were filed March 2017, and I think he was served in May. The record will show that, May of 2017. He testifies that he makes this trip, a long trip to Texas, and he doesn't find anybody home, but he's not able to talk to anybody. There's no witnesses, and after two or three hours, he just turns around and drives home. Is that his testimony? Yes, Your Honor. Had limited time by virtue of his work schedule. And this August trip was three months before, less than three months, before they filed for the, no, yeah, less than three months before they filed for custody. So about three months after he makes this alleged trip, they filed for custody. Well, I don't know if they filed, the timing of the filing, but the order was entered in November. The order, I'm sorry, was entered. So we don't even know at this point when the petition for custody was filed. It's, that D case is in the record, Your Honor, and I have summarized the filings in that case in the appendix to the brief. Okay. So it's there. I don't have the record. But from the moment Mr. Lynch learned of any legal proceeding, has he fought it? Absolutely. I mean, has he missed a court date? Has he fought every step of the way? Absolutely. And the record will show that. I'm going to have to testify to it. I know that's true. But it's in the record. He appeared every time he testified. He even appeared at the best interest hearing, which was by that point more or less of a formality, but he wanted to be here, and he was there. So unless there are more questions, I'm finished. All right. Counsel. Thank you. According to your arguments, the court will take this matter under review. The decision is yours.